UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

**07 CV      2917**

NATHAN A. LOW and SUNRISE
    FOUNDATION TRUST,

                Plaintiffs,

    - against -

WORKSTREAM INC. and MICHAEL
    MULLARKEY,

                Defendants.

------------------------------------------------------------X

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

        Plaintiffs Nathan A. Low and the Sunrise Foundation Trust, for their complaint against Defendants Workstream Inc. ("Workstream" or the Company") and Michael Mullarkey ("Mullarkey"), allege as follows:

## NATURE OF ACTION

        1.  On December 20, 2004, Nathan A. Low and Sunrise Foundation Trust collectively purchased 666,667 shares of Workstream Inc. common stock and 333,334 warrants (to purchase 333,334 shares of Workstream common stock for $3.50 per share on or before December 31, 2008) from Defendant Workstream for $2,000,004.  In order to induce Plaintiffs to make this investment, Michael Mullarkey, the president, chief executive officer, and chairman of the board of Workstream, made materially false and misleading statements concerning Workstream's financial performance.  When the truth was disclosed, the price of Workstream's stock immediately dropped by approximately 50%.  Plaintiffs eventually sold their Workstream stock for a loss of over $1 million. Workstream's common

stock sold publicly for $2.95 a share on December 30, 2004; its price at the close of trading on March 26, 2007 was $1.27.

## JURISDICTION AND VENUE

2.   The claims asserted herein arise under and pursuant to section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under New York State law, for which the Court's supplemental jurisdiction under 28 U.S.C. § 1367 is invoked.

3.   This Court has jurisdiction over the subject matter of this action pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

4.   Venue is proper in this Judicial District pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the closing at which Plaintiffs acquired Workstream securities, took place in this Judicial District.

5.   In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## PARTIES

6.   Plaintiff Nathan A. Low purchased 333,334 shares of Workstream common stock and 166,667 warrants (to purchase 166,667 shares of common stock at $3.50 per share on or before December 31, 2008) for $1,000,002 on December 20, 2004.

7.   Plaintiff Sunrise Foundation Trust is a charitable trust with its principal place of business at 641 Lexington Avenue, New York, New York 10022.  Plaintiff Sunrise Foundation Trust purchased 333,334 shares of Workstream common stock and 166,667 warrants (to purchase 166,667 shares of common stock at $3.50 per share on or before December 31, 2008) for $1,000,002 on December 20, 2004. Plaintiff Nathan Low is a trustee of the Sunrise Foundation Trust and makes all investment decisions for the trust.

8.   Defendant Workstream is a Canadian corporation with its principal place of business at 495 March Road, Suite 300, Ottawa, Ontario K2K 3G1, Canada.  It maintains an office in White Plains, New York.

9.   Defendant Michael Mullarkey was, at all times relevant hereto, the chairman, president, and chief executive officer of Workstream.

## FACTS

10.   Workstream's stock is publicly traded in the United States on the NASDAQ Stock Market.

11.   Workstream operates in the Enterprise Workforce Management, or EWM, industry, which provides services for the human resource requirements of businesses.  The EWM industry is fragmented because companies within it provide a limited range of services.  Workstream has attempted to develop services for the complete range of business human resource needs – from recruitment to exit interviewing – so that it can be a full service provider for its customers.

12.   A major component of Workstream's strategy is the acquisition of established companies in industry segments where Workstream has little or no presence. In order to make acquisitions, Workstream has turned to private sources of capital, including Plaintiffs.

13.   In furtherance of such an acquisition, Workstream entered into discussions with Plaintiffs in late 2004. At this time, Workstream was negotiating for the acquisition of ProAct Technologies Corporation, which provided software and hosted web-based tools for employee benefits management. Those negotiations would culminate in an agreement entered into on Monday, December 20, 2004 pursuant to which Workstream agreed to acquire, through a subsidiary, ProAct for total consideration of $9,730,000, including $5,500,000 in cash upon closing.

14.   While Workstream was negotiating for the purchase of ProAct, it was also negotiating with private sources of financing, which would be necessary for the ProAct acquisition and other acquisitions.

15.   Throughout this period, Workstream had a series of telephone conversations with Mr. Low (individually and in his capacities as a trustee of the Sunrise Foundation Trust and a partner of Sunrise Equity Partners, L.P.). Mullarkey also had a number of telephone conversations with Marilyn Adler, another partner of Sunrise Equity Partners, L.P. Mullarkey was acting as Workstream's president and chief executive officer in these conversations.

16.   During telephone conversations with Mr. Low (and Ms. Adler), Mullarkey represented that Workstream would have the following revenue, in millions of dollars, for the quarters ending on the dates indicated:

4

| Nov. 2004 | Feb. 2005 |
|-----------|-----------|
| 8.5-9.0   | 10.5      |

17.   Mullarkey also told Mr. Low (and Ms. Adler) that for the year ended May 31, 2005 revenues would be $44 million, EBITDA (earnings before interest, taxes, depreciation, and amortization) would be $8 million, and net income would be $800,000.

18.   In reliance on these representations, on December 19, 2004, there was a series of e-mail communications between Mr. Low, Ms. Adler, and Amnon Mandlebaum (also a partner in Sunrise Equity Partners, L.P.) concerning an investment in Workstream. In a December 19, 2004 (9:00 PM) email to Messrs. Low and Mandelbaum, Ms. Adler repeated that Mullarkey had said to her that Workstream "has a recurring revenue model" and that it is "paid $1 per employee per month for 36 months, which is the length of a typical contract. A 10,000 person company will give them a 3 year contract for $360,000 value. That is the price for only one module and Workstream has 7 different modules to offer."

19.   Ms. Adler also wrote in that December 19, 2004 (9:00 PM) email based on her prior conversation with Mullarkey that:

> Workstream did $5.7mm [million] for the quarter ended August 31, 2004 and will do $8.5mm to $9.0mm for the quarter ended November 30, 2004. If you annualize $8.5mm run rate to be $34mm of revenues for the year and add in $10mm of revenues for the ProAct acquisition, then $44mm of revenues. At $120mm market cap, Workstream is trading at 2.7x revenues, which is much lower than the average of the 4 comps [comparable companies] (6.1x revenue). Even if you look at the lowest comp, which is 4.3x, Workstream would trade at $189mm market cap, which would equate to a downside of $4.58 per share, well above the $3 price.

Mr. Mullarkey had also provided these figures to Mr. Low.

20.   In reliance upon the statements made by Defendants, on December 20, 2004, Plaintiffs collectively purchased 666,667 shares of Workstream Inc. common stock and 333,334 warrants (to purchase 333,334 shares of Workstream common stock for $3.50 per share on or before December 31, 2008) from Defendant Workstream for $2,000,004.  The price of Workstream common stock was $2.95 per share at the close of trading on December 20, 2004.

21.   Contrary to Mullarkey's representations, Workstream's revenues for the quarter ending November 30, 2004 were $7,147,824 and not the $8.5-$9 million represented by Mullarkey.

22.   Workstream disclosed that its revenues for the quarter ending November 30, 2004 were $7,147,824 in a Form 10-Q quarterly report filed with the Securities and Exchange Commission on January 14, 2005 as well as in a press release issued after the close of trading on January 14, 2005.

23.   In that press release, Mullarkey was also quoted as saying, "As we enter the February 2005 quarter, we have strong visibility into our quarterly revenue target of $10 million, positive cash flow from operations and positive EBITDA driven by the strength of our subscription and services revenues."

24.   Contrary to Mullarkey's  representations, Workstream disclosed in a Form 10-Q quarterly report filed with the Securities and Exchange Commission on April 14, 2005 as well as in a press release issued after the close of trading on April 14, 2005 that its revenues for the quarter ending February 28, 2005 were $6,874,735 and not the $10.5 million that Mullarkey represented to Plaintiffs.

25.  The price of Workstream's common stock on the NASDAQ stock market closed on April 14, 2005 at $3.99 per share. It opened on April 15, 2005 at $2.40, and closed trading that day at $1.90, over 50% below the prior day's close.

**Scienter**

26.  Mullarkey's statements to Plaintiffs concerning Workstream's performance in the quarter ending November 30, 2004 were made either recklessly or with knowledge that they were not true. That quarter had been completed nearly three weeks before Mullarkey's statement. As president and chief executive officer of Workstream, Mullarkey knew the true performance of Workstream for that period and, if he did not have such knowledge, it was a misrepresentation for him to have spoken as if he did.

27.  Mullarkey's statements to Plaintiffs concerning how Workstream would perform for the quarter ending February 28, 2005 were made knowing that they were not true, or recklessly. Mullarkey told Plaintiffs that because of the nature of Workstream's business, it was virtually certain that the predicted $10.5 million in revenue for the quarter would be realized. He said that he was able to accurately predict the Company's performance because the Company's revenue comes from three year contracts and the Company has a recurring revenue model. Mullarkey also told Mr. Low (and Ms. Adler) that Workstream was paid on a per-employee basis by companies with which it has contracts and that the minimum terms of those contracts was 36 months. For example, he said that Charter Communications had 10,000 employees covered, for which it paid Workstream $10,000 per month or $120,000 per year, $360,000 total for the full three year contract. He said that the product pays for itself in six months. Mullarkey gave Mr. Low (and Ms. Adler) specifics of

7

other outstanding contracts that Workstream had, all of which provided for an assured revenue stream to Workstream.

28.    Workstream and Mullarkey had a motive to mislead Plaintiffs.  Workstream needed to have Plaintiffs and others invest money in Workstream for Workstream to close the deal for ProAct and for future acquisitions.  In his conversations with Mr. Low, Mullarkey was made aware that Workstream's revenues were critical to Plaintiffs (and Sunrise Equity Partners, L.P.) in deciding whether to invest in Workstream.  Mullarkey knew that if the revenue figures he provided were not high enough, Plaintiffs (and Sunrise Equity partners, L.P.) would not agree to invest in Workstream and that this, in turn, would make it difficult if not impossible for Workstream to close on its acquisition of ProAct or make future acquisitions.

29.    Immediately after Workstream disclosed its performance for the quarter ending February 28, 2005, Mr. Low (and Ms. Adler) attempted on numerous occasions to speak to Mullarkey, but Mullarkey did not take their calls.  Mullarkey met with Mr. Low, Ms. Adler, and Mr. Mandelbaum, at their office in New York on November 2, 2005.  During this meeting, Mullarkey acknowledged that he had given them materially false information and he told them that Workstream would make up for the losses that Plaintiffs (and Sunrise Equity Partners, L.P.) suffered from their Workstream investments.  Workstream and Mullarkey reneged on this agreement.  From November 2 to November 16, numerous attempts were made to speak with Mullarkey, and a number of e-mails were sent to set a time for a discussion.  Even when one was scheduled, however, Mullarkey "forgot" about it and

ultimately Mullarkey "forgot" about his agreement to make good on the losses, thereby rendering this action necessary.

## FIRST CLAIM FOR RELIEF
### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder

30. Plaintiffs incorporate by reference paragraphs 1 through 29.

31. Defendants carried out a plan, scheme, and course of conduct that was intended to and did deceive Plaintiffs and cause them to purchase Workstream securities. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

32. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements that were made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs as purchasers of Workstream's securities in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

33. Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made about Workstream and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs.

34. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and with the effect of inducing Plaintiffs to purchase Workstream securities.

35.   As demonstrated by Defendants' misstatements of the Company's business, operations, and revenues, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

36.   At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true.   Had Plaintiffs known the truth regarding Workstream's financial performance, Plaintiffs would not have acquired Workstream securities.

37.   Plaintiffs were induced to acquire Workstream securities by the misrepresentations made by Mullarkey and Workstream.

38.   By virtue of the foregoing, Defendants have violated section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

39.   As a direct and proximate result of Defendants' wrongful conduct violative of section 10(b) of the Exchange Act, Plaintiffs suffered damages in connection with its purchases of Workstream securities in an amount to be established at the trial of this action.

## SECOND CLAIM FOR RELIEF
### New York Common Law

40.    Plaintiffs incorporate by reference paragraphs 1 through 39.

41.    Workstream and Mullarkey made false and misleading statements to Plaintiffs for the purpose of inducing Plaintiffs to purchase Workstream securities.

42.    Plaintiffs purchased Workstream securities in reasonable reliance on the truthfulness of the statements made by Workstream and Mullarkey.

43.    Plaintiffs suffered damages as a result of Defendants' fraudulent and negligent misrepresentations in an amount to be established at the trial of this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(i)    Awarding compensatory damages in favor of Plaintiffs against Defendants, jointly and severally, for the damages sustained by Plaintiffs as a result of Defendants' wrongdoing in an amount to be established at the trial of this action, plus interest thereon;

(ii)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(iii)    Awarding Plaintiffs punitive damages; and

(iv)    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   New York, New York
       April 11, 2007

                                     Respectfully submitted,

                                     RABIN & PECKEL LLP

                                     By: _____
                                                I. Stephen Rabin – IR 5058
                                     Joseph V. McBride – JM 3550
                                     275 Madison Avenue, Suite 420
                                     New York, NY 10016
                                     Telephone:  (212) 880-3722
                                     Facsimile:  (212) 880-3716

                                     Attorneys for Plaintiffs

12